COPY

FILED

10 SEP 17 PM 3:40

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

1  ROBBINS UMEDA LLP
   BRIAN J. ROBBINS (190264)
2  brobbins@robbinsumeda.com
   FELIPE J. ARROYO (163803)
3  farroyo@robbinsumeda.com
   ARSHAN AMIRI (246874)
4  aamiri@robbinsumeda.com
   600 B Street, Suite 1900
5  San Diego, CA 92101
   Telephone: (619) 525-3990
6  Facsimile: (619) 525-3991

7  Attorneys for Plaintiff

8  [Additional counsel on signature page]

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                   WESTERN DIVISION

12
   DANIEL HIMMEL, Derivatively on        Case No. SACV10-1417-JVS(MLGx)
13 Behalf of ALLERGAN, INC.,
                                         VERIFIED SHAREHOLDER
14             Plaintiff,                DERIVATIVE COMPLAINT FOR
                                         VIOLATIONS OF FEDERAL
15     v.                                SECURITIES LAWS, BREACH OF
                                         FIDUCIARY DUTY, WASTE OF
16                                       CORPORATE ASSETS, AND
   DAVID E. I. PYOTT, HERBERT W.         UNJUST ENRICHMENT
17 BOYER, GAVIN S. HERBERT,
   LEONARD D. SCHAEFFER,
18 MICHAEL R. GALLAGHER,
   STEPHEN J. RYAN, RUSSELL T.
19 RAY, TREVOR M. JONES, ROBERT
   A. INGRAM, LOUIS J. LAVIGNE, JR.,
20 DEBORAH DUNSIRE, DAWN
   HUDSON, HANDEL E. EVANS,
21 RONALD M. CRESSWELL, LOUIS T.
   ROSSO, KAREN R. OSAR, and
22 ANTHONY H. WILD,

23             Defendants,

24     -and-

25 ALLERGAN, INC., a Delaware
   corporation,
26
               Nominal Defendant.
27
                                         DEMAND FOR JURY TRIAL
28

_____
        VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Allergan, Inc. ("Allergan" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy their violations of federal and state law, including breaches of fiduciary duties, waste of corporate assets, and unjust enrichment that have caused substantial monetary losses to Allergan and other damages, such as impairment to its reputation and goodwill.

2.     This derivative action arises from the Board of Directors (the "Board") of Allergan knowingly causing and permitting the Company to engage in a decade long systematic illegal marketing and promotion scheme for its most important product, Botox, and certain other drugs. On September 1, 2010, the U.S. Department of Justice (the "DOJ") announced a $600 million settlement of civil and criminal claims against Allergan concerning the Company's promotion of Botox for unapproved use.

3.     In order to push sales of Botox, the defendants devised, implemented, and allowed a Company-wide scheme to convince medical providers to use Botox in unapproved ways.  Towards the end of the drug development process, pharmaceutical companies submit drugs for approval to the U.S. Food and Drug Administration ("FDA").  When a pharmaceutical company submits a drug, it specifies the particular purpose for which the drug is to be used.  Usually, there is extensive testing of the drug to support its use for this purpose.  If it finds the drug's benefits outweigh the risks, the FDA approves its use for the specified purpose.  The specific approved use is called the "indication" for which the drug may be prescribed.  The FDA specifies particular dosages determined to be safe and effective for each indication.

4.     Even though the FDA approves a drug for a particular use, doctors, however, are free to prescribe it for other uses, known as "off-label" use.  Off-label

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

prescriptions of a drug can significantly increase its use, and correspondingly, the income to the pharmaceutical company that makes the drug. There are obvious dangers in prescribing a drug for unapproved, and many times untested, use. Accordingly, the Food, Drug, and Cosmetics Act ("FDCA") prohibits a pharmaceutical company from promoting the off-label use of its drug or from making misleading claims as to a drug's safety or effectiveness.

5. The penalties for violating the FDCA are harsh. In addition to substantial criminal and civil penalties and fines, violators of the FDCA can be excluded from participation in Medicare and Medicaid. Exclusion from these government run insurance programs would cripple almost all medical companies, as they would no longer be able to access the largest potential source of revenues.

6. Despite the perils of illegal off-label marketing practices, the Board permitted the Company to engage in a decade long scheme to misbrand Botox and other drugs. Allergan's systematic disregard of the laws was widespread and blatant. Allergan doubled the size of its support staff assisting doctors in obtaining payment for off-label Botox use, implemented Company-wide initiatives to expand Botox's off-label use, which included coordinated efforts by three different divisions in the Company, created allegedly "independent" educational organizations that promoted the off-label use of Botox, and paid doctors to attend elaborate dinners and retreats focused on off-label uses for Botox. According to the DOJ, "Allergan made it a top corporate priority to maximize sales of far more lucrative off-label uses that were not approved by FDA." Making this off-label marketing of Botox even worse is that "there was little clinical evidence that these [off-label] uses were effective." The wrong-doing at the Company was so widespread that five different whistleblowers filed actions on behalf of the United States alleging violations of the False Claim Act. Moreover, since 2003, the FDA has sent the Company at least three warning letters complaining about the marketing practices at the Company, including a letter in June 2003 that stated the Company issued false and misleading advertising about Botox.

7.    While the Board was sufficiently aware of the illegal off-label marketing scheme at the Company, Allergan's shareholders were not.  In seeking reelection to their lucrative positions and increased benefits under a shareholder approved incentive plan, the Board failed to disclose material information to the Company's shareholders necessary to make an adequately informed decision in violation of federal law.  As a result, the Company's shareholders reelected members of the Board and approved the incentive plans, allowing these defendants to continue to harm the Company, and reap undeserved compensation.

8.    As a result of this illegal scheme to boost Botox sales, the Company has agreed to pay $600 million as part of civil and criminal settlements.  The civil settlement addresses allegations that from 2001 through at least 2008, Allergan: (i) promoted Botox for off-label indications that were not medically accepted and therefore not covered by federal health care programs; (ii) made unsubstantiated and misleading statements about the safety and efficacy of Botox for off-label indications; (iii) instructed doctors to miscode Botox claims for uncovered indications using inappropriate diagnosis codes to ensure payment by government health care programs; and (iv) provided inducements to doctors to inject more Botox.  As a result of the civil settlement, the Company will pay $225 million to federal and various state governments.  Allergan also agreed to plead guilty for a criminal misdemeanor for misbranding Botox.  The Company will pay a criminal fine of $375 million.  The Company also entered into a five year corporate integrity agreement ("CIA") with the Department of Health and Human Services' Office of Inspector General (the "OIG").  Under the CIA, the Company will have to submit compliance reports to the OIG and undertake additional compliance related activities, such as additional monitoring, auditing, and training.

9.    Plaintiff now brings this litigation on behalf of Allergan and seeks to rectify the conduct of the individuals bearing ultimate responsibility for the harm to the Company—the directors on the Board and senior management, to impose

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   responsibility upon those individuals, and to recover for damages sustained by

2   Allergan due to defendants' violations of federal law, breaches of fiduciary duty, unjust

3   enrichment, and waste of Company assets.

### JURISDICTION AND VENUE

5       10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331

6   and §1332 (a)(2), in that this complaint presents a federal question and the plaintiff and

7   defendants are citizens of different states and the matter in controversy exceeds

8   $75,000, exclusive of interests and costs.  This Court has supplemental jurisdiction

9   over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is

10  not a collusive one to confer jurisdiction on a court of the United States which it would

11  not otherwise have.

12      11.    Venue is proper in this District because a substantial portion of the

13  transactions and wrongs complained of herein, including the defendants' primary

14  participation in the wrongful acts detailed herein, occurred in this District.  Several

15  defendants either reside in or maintain executive offices in this County, and have

16  received substantial compensation in this County by engaging in numerous activities

17  and conducting business here, which has an effect in this District.

### THE PARTIES

19      12.    Plaintiff, Daniel Himmel, was a shareholder of Allergan at the time of the

20  continuing wrong of which he complains.  Since becoming a shareholder, plaintiff has

21  continuously been a shareholder.  Plaintiff is a citizen of Florida.

22      13.    Nominal defendant Allergan is incorporated under the laws of the State of

23  Delaware and maintains its principal executive office at 2525 Dupont Drive, Irvine,

24  California.  Allergan is a global, multi-specialty health care company. The Company

25  specializes in specialty pharmaceuticals (primarily eye care, skin care, and

26  neuromodulators) and medical devices (primarily breast implants, gastric bands for

27  obesity surgery, and injectable dermal fillers used on facial wrinkles).  The Company

28  offers a number of specialty products, including: Botox® (onabotulinum toxin A);

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

RESTASIS® (cyclosporine ophthalmic emulsion); LUMIGAN® (bimatoprost ophthalmic solution); Botox Cosmetic (onabotulinum toxin A); the JUVEDERM family of dermal fillers; and the LAP-BAND® Adjustable Gastric Banding System.

14.   Defendant David E.I. Pyott ("Pyott") is Allergan's Chief Executive Officer ("CEO") and has been since January 1998. Pyott is also Allergan's Chairman of the Board and has been since 2001 and a director and has been since 1998. Pyott was Allergan's President from January 1998 to February 2006. Pyott was a director when the 2008, 2009, and 2010 proxy statements were released. Defendant Pyott is a citizen of California.

15.   Defendant Herbert W. Boyer ("Boyer") is Allergan's Vice Chairman and has been since 2001; Lead Independent Director and has been since at least March 2004; and a director and has been since 1994. Boyer was also Allergan's Chairman of the Board from 1998 to 2001. Boyer is a member of Allergan's Corporate Governance and Science and Technology Committees and has been since at least March 1999. Boyer was a director when the 2008, 2009, and 2010 proxy statements were released. Defendant Boyer is a citizen of California.

16.   Defendant Gavin S. Herbert ("Herbert") is Allergan's Chairman Emeritus and has been since 1996 and a director and has been since 1950. Herbert was also Allergan's Chairman of the Board from 1977 to 1996; CEO from 1961 to 1991; and President from 1961 to 1977. Herbert is a member of Allergan's Science and Technology Committee and has been since at least March 1999 and was a member of the Audit and Finance Committee from at least March 1999 to September 2004. Herbert founded Allergan. Herbert was a director when the 2008, 2009, and 2010 proxy statements were released. Defendant Herbert is a citizen of California.

17.   Defendant Leonard D. Schaeffer ("Schaeffer") is an Allergan director and has been since 1993. Schaeffer is also a member of Allergan's Corporate Governance Committee and has been since April 2003 and was a member of the Audit and Finance Committee from at least March 1999 to April 2003. Schaeffer was a director when the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   2008, 2009, and 2010 proxy statements were released.  Defendant Schaeffer is a citizen
2   of California.

3          18.    Defendant Michael R. Gallagher ("Gallagher") is an Allergan director and
4   has been since 1998.  Gallagher is also a member of Allergan's Audit and Finance
5   Committee and has been since at least March 2005 and was a member of the Corporate
6   Governance Committee from at least March 1999 to January 2005.  Gallagher was a
7   director when the 2008, 2009, and 2010 proxy statements were released.  Defendant
8   Gallagher is a citizen of California.

9          19.    Defendant Stephen J. Ryan ("Ryan") is an Allergan director and has been
10  since September 2002.  Ryan is also Chairman of Allergan's Science and Technology
11  Committee and has been since at least March 2004 and a member and has been since
12  September 2002.  Ryan is a member of Allergan's Audit and Finance Committee and
13  has been since September 2002.  Ryan was a director when the 2008, 2009, and 2010
14  proxy statements were released.  Defendant Ryan is a citizen of California.

15         20.    Defendant Russell T. Ray ("Ray") is an Allergan director and has been
16  since April 2003.  Ray is also Chairman of Allergan's Audit and Finance Committee
17  and has been since at least March 2005 and a member and has been since April 2003.
18  Ray was a director when the 2008, 2009, and 2010 proxy statements were released.
19  Defendant Ray is a citizen of Massachusetts.

20         21.    Defendant Trevor M. Jones ("Jones") is an Allergan director and has been
21  since July 2004.  Jones is also a member of Allergan's Corporate Governance and
22  Science and Technology Committees and has been since at least March 2004.  Jones
23  was a director when the 2008, 2009, and 2010 proxy statements were released.
24  Defendant Jones is a citizen of the United Kingdom.

25         22.    Defendant Robert A. Ingram ("Ingram") is an Allergan director and has
26  been since January 2005.  Ingram is also Chairman of Allergan's Corporate
27  Governance Committee and has been since May 2007 and a member and has been
28  since January 2005.  Ingram was a member of Allergan's Science and Technology

- 6 -

1  Committee from at least March 2005 to May 2007.  Ingram was a director when the
2  2008, 2009, and 2010 proxy statements were released.  Defendant Ingram is a citizen
3  of North Carolina.

4       23.    Defendant Louis J. Lavigne, Jr. ("Lavigne") is an Allergan director and
5  has been since July 2005.  Lavigne is also a member of Allergan's Audit and Finance
6  and Science and Technology Committees and has been since at least March 2006.
7  Lavigne was a director when the 2008, 2009, and 2010 proxy statements were released.
8  Defendant Lavigne is a citizen of California.

9       24.    Defendant Deborah Dunsire ("Dunsire") is an Allergan director and has
10 been since December 2006.  Dunsire is also a member of Allergan's Corporate
11 Governance and Science and Technology Committees and has been since December
12 2006.  Dunsire was a director when the 2008, 2009, and 2010 proxy statements were
13 released.  Defendant Dunsire is a citizen of Massachusetts.

14      25.    Defendant Dawn Hudson ("Hudson") is an Allergan director and has been
15 since January 2008.  Hudson is also a member of the Audit and Finance Committee
16 and has been since January 2008.  Hudson was a director when the 2008, 2009, and
17 2010 proxy statements were released.  Defendant Hudson is a citizen of New York.

18      26.    Defendant Handel E. Evans ("Evans") was an Allergan director from
19 1989 to May 2007.  Evans was also Chairman of Allergan's Corporate Governance
20 Committee from at least March 2001 to May 2007 and a member of the Audit and
21 Finance Committee from at least March 1999 to at least March 2001.  Defendant Evans
22 is a citizen of Pennsylvania.

23      27.    Defendant Ronald M. Cresswell ("Cresswell") was an Allergan director
24 from 1998 to July 2004.  Cresswell was also Chairman of Allergan's Science and
25 Technology Committee from at least March 2000 to July 2004 and a member from at
26 least March 1999 to July 2004.  Cresswell was a member of Allergan's Corporate
27 Governance Committee from at least March 1999 to at least March 2004.  Defendant
28 Cresswell is a citizen of Michigan.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1        28.    Defendant Louis T. Rosso ("Rosso") was an Allergan director from 1989

2   to April 2005. Rosso was also a member of Allergan's Audit and Finance Committee

3   from at least March 1999 to April 2005 and served as Chairman of the Committee from

4   at least March 1999 to at least March 2000. Rosso was a member of Allergan's

5   Science and Technology Committee from at least March 2001 to April 2005.

6   Defendant Rosso is a citizen of California.

7        29.    Defendant Karen R. Osar ("Osar") was an Allergan director from 1998 to

8   September 2005. Osar was also Chairman of Allergan's Audit and Finance Committee

9   from at least March 2001 to September 2005. Defendant Osar is a citizen of

10  Connecticut.

11       30.    Defendant Anthony H. Wild ("Wild") was an Allergan director from 2000

12  to September 2002. Wild was also a member of Allergan's Audit and Finance

13  Committee in at least 2002 and a member of the Science and Technology Committee

14  from at least March 2001 to at least March 2002. Defendant Wild is a citizen of New

15  York.

16       31.    The defendants identified in ¶¶14-30 are referred to herein as the

17  "Director Defendants." The defendant identified in ¶14 is referred to herein as the

18  "Officer Defendant." The defendants identified in ¶¶16-20, 23, 25-30 are referred to

19  herein as the "Audit Committee Defendants." The defendants indentified in ¶¶ 14-25

20  are referred to herein as the "Proxy Defendants." Collectively, the Director Defendants,

21  the Officer Defendant, the Audit Committee Defendants, and the Proxy Defendants are

22  referred to herein as the "Individual Defendants."

23                 **DUTIES OF THE INDIVIDUAL DEFENDANTS**

24       32.    By reason of their positions as officers, directors, and/or fiduciaries of

25  Allergan and because of their ability to control the business and corporate affairs of

26  Allergan, the Individual Defendants owed Allergan and its shareholders fiduciary

27  obligations of trust, loyalty, good faith, and due care, and were and are required to use

28  their utmost ability to control and manage Allergan in a fair, just, honest, and equitable

manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Allergan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33.     Each director and officer of the Company owes to Allergan and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Allergan, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Allergan, and was at all times acting within the course and scope of such agency.

36.     To discharge their duties, the officers and directors of Allergan were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Allergan were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets; and

(c)     remain informed as to how Allergan conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws and regulations.

37.   The Company states that it is committed to ethically selling its products and has noted the importance of its reputation.  In defendant Pyott's "Letter from the Chief Executive Officer" found in Allergan's Code of Business Conduct and Ethics (the "Code"), he notes that, **"THERE IS NO RIGHT WAY TO DO A WRONG THING."**  In addition, he states that:

> A large part of Allergan's success may be attributed to our reputation in the marketplace for the quality and safety of our products and for the values and principles that guide our business relationships, including our strong sense of ethics.  This Code of Business Conduct and Ethics represents our formal commitment to the principles of honesty, integrity, and fairness in everything we do, so that as a company our activities reflect positively on our stockholders, the marketplaces we serve, the community, and on ourselves.  These principles are not new at Allergan.  They are simply the statements of our long-standing policy that all business conducted by Allergan employees and representatives will be conducted ethically and in compliance with all applicable laws.

> One simple reason for upholding the law is that our continued success as a company depends on it.  In the health care business, any legal or ethical violation has the potential to harm patients and damage our reputation.  I believe that the best reason for abiding by the law and the principles contained in this Code of Business Conduct and Ethics is that it is simply the right thing to do.  We all want to work for a company that we believe consistently strives to do the right thing.  The best way to ensure that Allergan does the right thing is for each employee to obey the law in his or her own job responsibilities and to help others do what is right.

38.   The Code notes that all directors, officers, employees, and independent consultants are required to "comply with all applicable laws and regulations."  In

- 10 -

addition, the Code states that "know[ing] and observ[ing] applicable laws and regulations and Allergan policies" is a "condition of employment" and that "[f]ailure to do so could subject an employee [defined earlier as an officer, director, employee, or independent consultant] and Allergan to sanctions, could harm Allergan's reputation and competitive position, and could result in disciplinary measures up to and including the termination of employment." The Code also required annual certification by all members of the Board and all other key employees.

39. Moreover, the Code requires directors and officers to "ensur[e] compliance with worldwide clinical and regulatory standards, including conduct of clinical studies, *marketing approvals*, good manufacturing practice requirements, labeling and advertising controls, and other mandated product regulations."

40. In addition to their fiduciary duties as directors and those imposed by the Code, certain directors were members of committees that placed additional duties on them. Pursuant to the Audit and Finance Committee's Charter, the members of the Audit and Finance Committee are specifically required to:

(a) Review the integrity of the Company's financial statements, financial reporting process and systems of internal controls regarding finance, accounting and legal compliance;

(b) Assist the Board in its oversight of the Company's compliance with legal and regulatory requirements; and

(c) Establish, review, and update periodically the Company's Code of Business Conduct and Ethics policy and ensure that management has established a system to enforce the Code.

41. Pursuant to the Corporate Governance Committee's Charter, the members of the Corporate Governance Committee are specifically required, *inter alia*, to:

(a) Review comprehensive reports from management regarding compliance-related matters affecting the Company and provide general compliance oversight to Allergan.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

43.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was engaging in the off-label and illegal marketing program described herein; (ii) enhance the Individual Defendants' executive and directorial positions at Allergan and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iii) deceive the investing public, including shareholders of Allergan, regarding the Individual Defendants' management of Allergan's operations.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

44.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the relevant period.  During this time, the Individual Defendants concealed the true fact that Allergan was misrepresenting its business prospects and methods.

45.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of federal law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

46.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by reviewing, participating in, and/or

- 12 -

1  allowing the Company to purposefully or recklessly engage in the illegal activity
2  described herein.  Because the actions described herein occurred under the authority of
3  the Board, each of the Individual Defendants was a direct, necessary, and substantial
4  participant in the conspiracy, common enterprise, and/or common course of conduct
5  complained of herein.

6       47.   Each of the Individual Defendants aided and abetted and rendered
7  substantial assistance in the wrongs complained of herein.  In taking such actions to
8  substantially assist the commission of the wrongdoing complained of herein, each
9  Individual Defendant acted with knowledge of the primary wrongdoing, substantially
10 assisted the accomplishment of that wrongdoing, and was aware of his or her overall
11 contribution to and furtherance of the wrongdoing.

12                           **BACKGROUND ON ALLERGAN AND BOTOX**

13      48.   Allergan is a Delaware incorporated company based in Irvine, California.
14 The Company specializes in manufacturing and marketing specialty pharmaceuticals
15 (primarily eye care, skin care, and neuromodulators) and medical devices (primarily
16 breast implants, gastric bands for obesity surgery, and injectable dermal fillers used on
17 facial wrinkles).

18      49.   Botox is a prescription-only medical product that contains tiny amounts of
19 highly purified botulinum toxin protein relined from the bacterium, *Clostridium*
20 *botulinum*.  In other words, Botox is a purified toxin.  When injected at approved and
21 labeled doses into a specific muscle or gland, Botox neurotoxin is expected to diffuse
22 locally, safely, and effectively by producing a localized and temporary reduction in the
23 overacting muscle or gland, usually lasting up to approximately three to six months
24 depending on the individual patient and indication.  Allergan markets and sells the
25 toxin under two distinct trade names "Botox" and "Botox Cosmetic," although these
26 products are exactly the same.

27      50.   Though Botox is widely known for its cosmetic use, the FDA has
28 approved the drug for therapeutic treatment of a few limited indications.  The FDA

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

approved the use Botox for the treatment of strabismus (Crossed-eyes), blepharospasm (involuntary eyelid muscle contractions) associated with dystonia, cervical dystonia (involuntary neck muscle contractions) in adults, and, in July 2004, axillary hyperhidrosis (excessive sweating) that cannot be managed effectively by topical treatments.

## THE EXTENSIVE REGULATION OF THE COMPANY

51.     Allergan's business is the focus of extensive regulation and regulatory oversight by the FDA. The FDCA, 21 U.S.C. §301 *et seq.*, regulates the development, manufacturing, and distribution of all drugs in the United States.

52.     Prior to 1962, pharmaceutical companies were permitted to promote drugs for any use in the United States. Congress banned the practice in 1962, however, after the disastrous consequences of the drug Thalidomide, a sedative that was widely prescribed to thousands of women suffering from morning sickness during pregnancy. The drug caused tragic birth defects in thousands of babies. As a result of this calamity, and in a legislative effort to prevent similar occurrences, the FDCA was enacted, requiring drug companies to scientifically establish that their drugs are safe and effective for specified intended uses and prohibiting the marketing of drugs for any use other than as specifically approved.

53.     Under the FDCA, drug companies are not allowed to market a drug until the drug has been approved by the FDA. Even once approved, the marketing of the drug must be confined to the approved use and dosage, as described on the drug's label. Drug companies may not engage in marketing or promoting unapproved or "off-label" uses or dosages, i.e, uses or dosages for which the drug has not been approved by the FDA and that are not on the label, because such off-label uses or dosages have not been proven safe and effective.

54.     The FDCA also prohibits the marketing or promotion of any drug that is misbranded. A drug is misbranded if the labeling or the advertising for the drug is false or misleading, or if the labeling or the advertising contains inadequate directions for

1  the drug's intended use. Because the FDA will not approve labels with directions for

2  off-label uses or dosages, off-label marketing also violates the FDCA's prohibition on

3  the marketing or promotion of drugs that are misbranded.

4       55.    Proving that a specific use or dosage is safe and effective for large

5  numbers of patients requires lengthy clinical trials and is very expensive. On the other

6  hand, drug companies derive immediate and substantial profits from off-label

7  prescriptions. As a result, executives at drug companies have a substantial short-term

8  financial incentive to break the law by marketing and promoting their drugs for uses

9  and dosages that are not proven to be medically safe and effective in treating large

10  numbers of patients in order to reap outsized incentive compensation, such as bonuses.

11  For the same reasons, these executives have a short-term financial incentive to

12  improperly provide gifts, money, and other kickbacks to doctors to induce and

13  encourage off-label prescriptions. The resulting improper prescriptions are frequently

14  reimbursed by federal healthcare programs such as Medicaid and Medicare, which in

15  turn subjects the perpetrator to liability under the False Claims Act and Federal anti-

16  kickback statute.

17       56.    Drug companies that violate the FDCA prohibition against misbranding or

18  introducing drugs, uses or dosages without FDA approval, are also subject to criminal

19  prosecution and, if convicted, face exclusion or "debarment" from Federal healthcare

20  programs. Such federal debarment would result in catastrophic damage to the

21  Company and its shareholders because Medicaid and Medicare would no longer cover

22  the costs of any Allergan drug and most patients would therefore find an alternative

23  drug sold by a competitor or would forego treatment altogether.

24  **THE INDIVIDUAL DEFENDANTS' ILLEGAL MARKETING SCHEME**

25       57.    Allergan's core business rests upon the marketing of its drugs, not only to

26  consumers, but also to doctors. As pointed out by the DOJ's press release announcing

27  the $600 million settlement, "Allergan made it a top corporate priority to maximize

28  sales of Botox for off-label uses." In order to accomplish this task, the Individual

1  Defendants have caused and permitted Allergan to openly violate and evade the legal
2  marketing restrictions applicable to its products.

3      58.   To start, Allergan employed and trained numerous "Botox Medical
4  Consultants" ("BMCs," later referred to as "NMCs" or Neurotoxin Medical
5  Consultants) to call and persuade identified doctors to prescribe Allergan drugs to
6  patients.  Notably, the BMCs would call physicians that would not typically treat
7  patients who had any of the four FDA-approved conditions for Botox use.  In addition,
8  Allergan had Botox "Customer Team Units" that coordinated sales initiatives among
9  different Company departments to focus on off-label marketing of Botox, including
10  sales/marketing, medical affairs (which consisted of purportedly independent scientific
11  advisors), and reimbursements divisions.

12      59.   Allergan also attempted to increase the use of Botox by making it easier
13  for doctors to seek reimbursement for their off-label use.  According to the information
14  filed by the DOJ, in 2003, the size of Allergan's reimbursement support team doubled
15  in order to "minimize customer barriers" for the use of Botox for headache, pain, and
16  spasticity, all unapproved uses.  The Company also recruited physicians to lobby
17  Medicare and Medicaid decision-makers to expand coverage for off-label uses, even
18  though the benefit of these uses lacked serious scientific support.

19      60.   Allergan tried to increase the use of Botox by paying for physician
20  training, workshops, dinners, and "advisory boards" that focused on the off-label use of
21  Botox.  One way it accomplished this task was by funding and controlling the content
22  of continuing medical education seminars ("CMEs"), injection workshops, and
23  promotion dinner programs at which paid speakers would advocate for off-label Botox
24  use.  Allergan also held "advisory board" meetings, which followed a similar script as
25  the Company's dinners and other funded events, namely paid speakers would tout the
26  benefits of using Botox for off-label purposes.  One such meeting occurred at the
27  Company's corporate headquarters and the Balboa Bay Club and Resort in Newport
28

- 16 -

1   Beach.  Doctors attending the meeting provided no consulting services, but were paid
2   $1,500 to listen to off-label marketing presentations.

3        61.    Allergan also created and funded an online neurotoxin education
4   organization to promote Botox for off-label use.  The Company gave this organization
5   approximately $8 million in unrestricted grants.  In turn, the organization maintained a
6   website containing videos of CMEs sponsored by the Company and other written
7   materials prepared by Allergan.  According to the DOJ's information, the Company's
8   sales representatives were specifically trained to refer doctors to this website during
9   sales calls.

10       62.    The purpose of Allergan's efforts was to increase the usage of Botox for
11  off-label purposes.  The Individual Defendants permitted and participated in this
12  scheme, even though they knew from the Company's own clinical studies that there
13  was little established benefit for most of Botox's off-label usage.

14  **THE INDIVIDUAL DEFENDANTS KNEW OR WERE RECKLESSLY**
15  **UNAWARE OF THE WRONGDOING AT THE COMPANY**

16       63.    The Individual Defendants could not help but know about the illegal
17  marketing activity at the Company due to its scope and pervasiveness at Allergan.
18  From 2000 to the present, Botox (in its therapeutic and cosmetic form) has accounted
19  for approximately 30% of the Company's sales.  Botox's therapeutic sales accounted
20  for over half that amount, worth hundreds of millions of dollars.  For example, in the
21  year ending December 31, 2006, the Company had $510 million worth of Botox
22  (therapeutic) sales.  Considering that Botox had only four FDA approved indications,
23  all of which are rare or rarely require Botox treatment, it was impossible for the
24  Company to hit these numbers without significant off-label sales.

25       64.    For instance, cervical dystonia, only occurs in nine out of every 100,000
26  people, or roughly 0.0009%.  Assuming there are 300 million Americans, this ratio
27  would correlate to 27,000 people with cervical dystonia.  Even assuming that every
28  single person with cervical dystonia used Botox at normal levels (300 units, four times

- 17 -

1   a year) and normal reimbursement rates ($5.102/unit), the Company's sales would

2   reach only approximately $165 million, less than 33% of the amount that the Company

3   actually sold in 2006.

4        65.   The numbers are not any better for Botox's other approved indications.

5   According to the relator complaint filed by Dr. Amy M. Lang and Charles J. Rushin,

6   patients with strabismus and severe primary hyperhidrosis rarely resort to Botox

7   treatment.  For patients that suffer from hyperhidrosis, the FDA had approved the use

8   of Botox only when topical agents fail to work.  Similarly, strabismus patients only use

9   Botox after less invasive and cheaper treatments (i.e., glasses) fail to correct the

10  problem.  Further, the amount of Botox used to treat strabismus (7.5 to 15 units per

11  eye) is significantly lower than the amount used to treat patients for off-label uses such

12  as headaches (100 to 200 units) and myofascial pain (200 to 400 units).

13       66.   In addition to the Company's financial results, the FDA's repeated

14  warnings also put the Individual Defendants on notice of the wrongdoing at the

15  Company.  From at least 2003 through 2009, Allergan received at least three FDA

16  warning letters informing the Company of misbranding and other potential violations

17  of the FDCA.  In particular, these warnings were:

18       &bull;  **June 23, 2003 BOTOX® COSMETIC Botulinum Toxin Type**

19          **A Warning Letter:** sent to Peter A. Kresel, former Senior Vice

20          President of Global Regulatory Affairs at Allergan to inform the

21          Company of violations of the FDCA regarding BOTOX®

22          COSMETIC Botulinum Toxin Type A by: (1) disseminating false

23          or misleading advertisement that falsely identify the product as a

24          cosmetic treatment, (2) failing to reveal material facts about the

25          product's use, and (3) minimizing the risk information presented.

26

27       &bull;  **September 6, 2005 Lumigan® (bimatoprost ophthalmic**

28          **solution) 0.03% Warning Letter:** sent to defendant Pyott, who at

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the time was the President and CEO of the Company and Chairman of the Board, to inform Allergan of misbranding Lumigan®, by distributing sales aids that arc misleading because they present unsubstantiated superiority claims in violation of the FDCA.

- **August 17, 2009 ACZONE® (dapsone) Gel, 5% Warning Letter**: sent to the attention of defendant Pyott, CEO and Chairman of the Board, to inform Allergan of violations of the FDCA and FDA implementing regulations regarding ACZONE® by: (1) false or misleading advertising overstating the efficacy of ACZONE®; and (2) omitting material facts and important risk information associated with the use of the product.

67.    The Federal Bureau of Investigation ("FBI") also began investigating Allergan in 2007 when the first of the whistleblower *qui tam* actions were filed against Allergan. In light of the above, the Individual Defendants knew, or in reckless disregard were unaware, of the illegal scheme occurring at the Company.

## THE MATERIALLY MISLEADING PROXY STATEMENTS

68.    Allergan's Annual Proxy Statements filed with the U.S. Securities and Exchange Commission ("SEC") on Form DEF 14A on or about March 20, 2008 (the "2008 Proxy Statement"), March 19, 2009 (the "2009 Proxy Statement"), and March 12, 2010 (the "2010 Proxy Statement") (collectively, the "Proxy Statements") were materially inaccurate in that they failed to disclose numerous highly material facts and circumstances. The materially inaccurate Proxy Statements caused direct harm to the Company in that, among other things, defendants' omissions perpetuated the systematic legal violations within the Company, which brought about the severe fines, penalties, and other liabilities to which the Company was ultimately subjected, as well as through

1   the creation of compensation obligations by the Company that would not have existed
2   but for the materially inaccurate and incomplete Proxy Statements.

3       69.    Each of the Proxy Statements was intended to, and did, procure Allergan's
4   shareholders' votes with respect to matters materially affecting the Company that
5   legally required shareholder approval. All three Proxy Statements sought and obtained
6   election of the Director Defendants by shareholder vote, in each case upon the Board's
7   explicit recommendation as to which directors should be elected. In addition, the 2008
8   Proxy Statement, sought and obtained shareholder approval for the 2008 Incentive
9   Award Plan, which authorized a twenty million share increase in the stock available for
10  grants to the Company's employees, executives, and directors for as little as one year of
11  positive performance. The 2008 Incentive Award Plan is particularly lucrative to the
12  Company's directors since it *automatically* provides them with 11,400 stock options
13  and 14,400 shares of restricted stock yearly. The Board portrayed the 2008 Incentive
14  Award Plan as a necessary increase in potential compensation to reward high-
15  performing employees, officers, and outside directors.

16      70.    Each director on the Board was duty-bound pursuant to his or her general
17  fiduciary duties under Delaware law and by the provisions of federal securities laws to
18  fully disclose all information material to shareholders' decision concerning how to cast
19  their votes in connection with the election of Board members in 2008, 2009, and 2010
20  and with respect to their decision whether to vote to approve the massive potential
21  compensation increases embodied in the 2008 Incentive Award Plan.

22      71.    Despite its obligations under fiduciary duty and the federal securities
23  laws, the Board caused the Company to file and disseminate the materially inaccurate
24  Proxy Statements. Specifically, in Allergan's definitive Proxy Statements, defendants
25  provided materially misleading information and disclosures concerning the Company,
26  the general responsibilities of the Board and its committees, and the basis upon which
27  the members of the Board (or prospective members of the Board) were seeking
28  election to another (or initial) term of office. In the Proxy Statements, defendants